Stanley R. Akers v. Commissioner.
Stanley R. Akers v. Commissioner.
Docket No. 26718.
United States Tax Court
1951 Tax Ct. Memo LEXIS 289; 10 T.C.M. (CCH) 264; T.C.M. (RIA) 51078; March 20, 1951
*289 Bert P. Hebenstreit, Esq., 1007 Nicholas Bldg., Toledo, Ohio, for the petitioner. Thomas V. Lefevre, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: Petitioner seeks redetermination of deficiencies in victory and income taxes for the taxable year ended December 31, 1943, in the amount of $7,089.24, and in income tax for the taxable years ended December 31, 1944, 1945, and 1946, in the amounts of $22,936.87, $22,653.52, and $18,119.07, respectively. The year 1942 is involved because of the provisions of the Current Tax Payment Act of 1943. The only issue is the validity for federal income tax purposes of an alleged partnership between the petitioner, his wife, and a third person. Part of the facts were stipulated and are so found. Findings of Fact Petitioner is an individual residing in Huntington Woods, Michigan. He filed his income tax returns on a cash basis for the taxable years with the collector of internal revenue for the district of Michigan. Petitioner and Phyllis M. Akers were married in 1936. Prior to marriage and for approximately three years thereafter Phyllis had been employed as a buyer for the *290 largest department store in Toledo, Ohio and had accumulated approximately $4,000 in personal savings. She maintained her own personal checking account in the Toledo Trust Company. For some 17 years prior to 1942 petitioner had been employed as a salesman and sales manager for the Reliance Steel Corporation. For over a year he had been seeking a business of his own. Petitioner had an uncle, David Emerman, who was associated in a number of large business enterprises with an older brother, Louis Emerman. Of these businesses David owned a 25 per cent stock interest and Louis a 75 per cent interest. These enterprises occupied the uncle's full time and in 1942 he had an annual income of more than $60,000. In 1941 petitioner learned that Meilink Steel Safe Company, an old established Toledo firm, could be purchased for $180,000. $100,000 in cash was needed for the transaction and as petitioner could not raise that much David Emerman agreed to participate in the purchase and advance the cash. An Ohio corporation, Meilink Steel Safe Company, was organized February 21, 1942. It purchased all assets of the old company for $100,000 cash and its promissory note of $80,000 also signed by *291 petitioner and Emerman. This not was subsequently paid. The corporation issued 1,000 shares of an authorized 2,000; 500 each to petitioner and Emerman. Emerman paid $100,000 into the corporation and took from petitioner his $50,000 note, evidencing Emerman's advance of that amount to him as the subscription price of petitioner's shares. The only payment on this note was $5,000 on November 27, 1942. Emerman joined in the transaction because he thought it promising and because he had confidence in petitioner's ability. Following the purchase it was necessary to modernize the corporation's plant and machinery. Emerman, who was skilled in machinery, supervised the procurement and installation of the modernized equipment; petitioner took charge of actual management and operation of the plant. Late in 1942 Louis Emerman learned for the first time of David's participation in the venture. The brothers' previous long standing arrangement had been to confine their business activities to their own enterprises and Louis thought David's safe company investment was a breach of faith. They quarreled and in order to effect a reconciliation David agreed to withdraw from Meilink Steel Safe Company. *292 He requested his attorney to arrange for the liquidation of his interest in the business, arranging if possible for the business to be retained by the Akers family. The details of the plan pursuant to which Emerman was to withdraw from the business were devised by Emerman's attorney after consultation with petitioner. The plan was embodied in two agreements which were presented to petitioner and Phyllis on February 1, 1943, on a "take it or leave it" basis. Petitioner, Emerman, and Phyllis were the parties to both agreements. In the first, petitioner conveyed to Phyllis one half of his interest in the assets of Meilink Steel Safe Company, the corporation in liquidation, in return for her delivery to Emerman of her note for $27,076.17 in partial retirement of petitioner's outstanding note to Emerman for $45,000, petitioner agreeing to deliver to Emerman a note for the balance of this amount, or $17,923.83. In return Emerman agreed to accept the two notes in satisfaction of the $45,000 note and to surrender it. Phyllis agreed to pay $10,000 on the principal of her note on or before February 28, 1943. As part of the same transaction the parties executed a second agreement which *293 provided for the formation of a partnership under the name, "Meilink Steel Safe Company," and for the contribution by each party of his share of the assets of the dissolved corporation as its capital. This agreement provided that petitioner "shall act as general manager of the partnership business, and shall be in full charge of its operation" and that Emerman should render supervisory services from time to time. No duties were prescribed for Phyllis. It was agreed that Emerman should receive $1,200 per year for his services, and by later amendment on April 30, 1943, that petitioner should receive $12,000 for his. This later amendment also provided that the net profits be divided as follows: 50 per cent to petitioner, 30 per cent to Phyllis, and 20 per cent to Emerman. Of the $10,000 which Phyllis agreed to and did pay within one month on her note to Emerman, $4,000 came from her own savings and the remaining $6,000 came from moneys deposited in her account for her by petitioner which had been obtained from the sale of securities previously purchased from time to time with funds withdrawn from a joint savings account which petitioner and Phyllis had maintained since their marriage. *294 The balance of this note was paid in installments by Phyllis by checks drawn on her personal checking account in which had been deposited her profit distributions received from the partnership. At and prior to the time when the notes were executed and the partnership agreements signed these documents were fully discussed and explained to Phyllis and she thoroughly understood all of the implications of her participation in the business as a partner. From the time of its organization on all business and public records where there was occasion to list the partners the partners were stated to be petitioner, Emerman, and Phyllis. Phyllis signed certain contracts and other papers when her signature was required Phyllis received monthly and annual financial analyses and reports prepared by the company's certified public accountant pertaining to the business, which she studied and discussed. She visited the plant in Toledo and the company's office in Detroit frequently. She was familiar with the company's affairs and was consulted as to major decisions. Other than that she performed no services for the partnership. Each of the partners was credited on the partnership books with his *295 distributive share of the income in accordance with the agreement and reported this share on his income tax return. During the period from February 1, 1943 to September 30, 1946, Phyllis' distributive share amounted to $89,243.49. Of this amount she actually received distributions aggregating $46,043.88 which were deposited by her in her personal checking account and used principally to pay her income taxes and make the payments on her note to Emerman. None of the funds Phyllis received from the partnership were used to pay family expenses, all of which were borne by petitioner. Nor did petitioner control or attempt to control Phyllis in her disposition of the moneys placed in her personal checking account. Upon the advice of the attorney and accountant for the partnership it was dissolved on December 30, 1946, and a new corporation organized to succeed it. Each partner received stock and debentures in the corporation in the exact face amounts of their capital interests in the partnership as reflected on the partnership books at the date of dissolution. Phyllis became and still is vice president and a director of the successor corporation. Phyllis was a bona fide partner with *296 petitioner and Emerman in Meilink Steel Safe Company from 1943 to 1946, inclusive. Opinion Again we are faced with the problem of deciding on all the facts whether the parties acting with a business purpose intended in good faith to form a real partnership or whether the transactions amounted to no more than a superficial device for rearranging the incidence of federal income taxes among the ostensible partners. Commissioner v. Culbertson, 337 U.S. 733. At the outset it is well to note that this is not the usual family milieu in which the actors are all members of the same family group. Here there were three actors, the husband, the wife, and a third person, who, although the husband's uncle, must be placed outside the family group.Both petitioner and respondent dwell on this variation, petitioner stressing its significance; respondent emphasizing its unimportance. Petitioner urges "that the evidentiary criteria laid down in the Culbertson case may be obviously met because this situation exists." We do not see the obviousness so clearly as does petitioner. We do think, however, that the participation of an extra-family actor is an evidentiary fact not to be overlooked *297 in getting at the core of the problem - the reality of the partnership. See Commissioner v. Culbertson, supra. The purpose in forming the partnership is clear enough. Petitioner and David Emerman had embarked together on a corporate venture from which Emerman found it necessary to withdraw. Emerman instructed his attorney to arrange the withdrawal, but if possible to have the business remain with the Akerses. The dissolution of the corporation and the formation of the partnership was the plan devised by Emerman's attorney. This plan would permit Emerman eventually to get out through liquidation of his investment and at the same time would allow the Akerses to stay in the business. Phyllis put $4,000 of her own savings into the property which became partnership property and at least part of the $6,000 payment made within a month after the partnership's formation on her note came from the proceeds of the sale of securities which had originally been purchased from a joint savings account she maintained with her husband and could also be counted as hers. She further obligated herself to the extent of some $17,000 on her note to Emerman in order to consummate the transaction. *298 She understood what it meant to become a partner and fully intended to be one. In her own words, she fully appreciated that she and her husband "were literally putting our eggs all in one basket and every thing we had and everything that we owned would be all tied up in this one venture." This record leaves no doubt but that the plan for the partnership was devised and put forward by Emerman's attorney. Phyllis' participation came as a result of his suggestion and not that of petitioner. This was not a scheme on the part of petitioner to make a paper allocation of part of his income to Phyllis. It was a partnership proposed by another for valid reasons of his own in which the Akerses were invited to join and in which they did join in entire good faith as partners to their mutual advantage. Respondent argues that Phyllis was, after all, merely a supernumerary actor, that she played no real role in the partnership, performed no services, and exercised no actual control over her share of the profits. We have not overlooked these arguments, but we think they are without substance. Petitioner has not contended that Phyllis contributed services to the partnership. To validate the partnership *299 he relies on the fact of her capital contribution plus the intent of the parties to form a real partnership. See O. H. Delchamps, 13 T.C. 281. Phyllis did actually control and use as much of her distributive share of the profits as she needed to make payments of her taxes and her obligation to Emerman. Nor was it necessary for her to spend or otherwise use the balance that remained to her credit on the partnership books to demonstrate her ownership of the funds. Cf. Funai v. Commissioner, 181 Fed. (2d) 890, (CCA 4). They were nonetheless hers. Furthermore, there is nothing in the record to indicate that anyone else claimed or exercised any control whatsoever over her share. After careful consideration we hold that a bona fide partnership existed in the taxable years, composed of Phyllis, Emerman, and the petitioner, and that the respondent erred in taxing to petitioner Phyllis' share of the partnership profits. Decision will be entered for the petitioner.